**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **KIMBERLY LOPEZ, as guardian, next** ) | |
| **friend and parent of GILBERTO LOPEZ,** ) | |
| **a minor,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff-Intervenor,** ) | |
| ) | |
| **v.** ) | **Case No. 3:07-0799** |
| ) | **Judge Echols** |
| **METROPOLITAN GOVERNMENT OF** ) | |
| **NASHVILLE AND DAVIDSON** ) | |
| **COUNTY, and GENESIS LEARNING** ) | |
| **CENTERS,** ) | |
| **Defendants.** ) | |

**MEMORANDUM**

This is an action brought by Plaintiff Kimberly Lopez ("Ms. Lopez") on behalf of her

disabled son Gilberto Lopez ("Gilberto"[1]) who was allegedly raped by another student while riding

a public school bus for special needs children. Presently pending before the Court are Plaintiff's

Motion for Summary Judgment (Docket Entry No. 183), and a Motion for Summary Judgment filed

by Plaintiff-Intervenor United States of America (Docket Entry No. 164). Also pending are cross-

Motions for Summary Judgment filed by Defendants Metropolitan Government of Nashville and

Davidson County ("Metro") (Docket Entry Nos. 174 & 178[2]), and Genesis Learning Centers

("GLC") (Docket Entry No. 169). The parties have also filed Motions related to the Summary

---

[1]In the papers before the Court, Gilberto is often referred to as "Gilbert." However, in the
Fourth Amended Complaint, he is identified as Gilberto.

[2]Metro seeks summary judgment with respect to both Plaintiff's Complaint and the
Complaint filed by Plaintiff-Intervenor.

1

Judgment filings, including Motions for Oral Argument (Docket Entry Nos. 218 and 225), Motions to Strike (Docket Entry Nos. 257, 259, and 266), Motions for Leave to File Excess Pages (Docket Entry Nos. 204 and 246), and Motions for Leave to File Reply Memorandums (Docket Entry Nos. 273 and 276).

In addition, the Plaintiff-Intervenor has filed a Motion for Review (Docket Entry No. 279) of a discovery Order issued by the Magistrate Judge. Finally, Plaintiff has filed a Motion to Remand (Docket Entry No. 280) the claims she brought against Defendant Metro under the Tennessee Governmental Tort Liability Act ("TGTLA").

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Background and Events Leading up to the Alleged Assault

Gilberto is a nine year old special needs child who suffers from an array of disabilities, including autism, mental retardation, emotional disturbance, speech impairment, and language impairment. In August 2006, Gilberto moved from Chicago to Nashville and enrolled in the Metropolitan Nashville Public School System ("Metro" or "MNPS"). Metro and MNPS receive federal financial assistance.

Shortly after the beginning of the 2006-07 school year, Gilberto was assigned to Genesis Academy ("Genesis" or "Academy") in Nashville, Tennessee. The Academy is a part of GLC, a private, non-profit corporation, which was founded by Terry Adams ("Mr. Adams"), GLC's Executive Director, and his wife, Melissa Adams ("Mrs. Adams"), GLC's Assistant Executive Director.

Metro assigns students with severe behavioral problems to Genesis. In fact, only students identified as engaging in problematic behavior that requires modification through a Severe Behavior Intervention Program ("SBI") are assigned to Genesis.

2

The contract between Metro and Genesis specifies that Metro is responsible for providing transportation services to the students who attend Genesis. Specifically, the contract in force during the relevant period provided:

> Duties and Responsibilities. Contractor shall provide special education and related services to students placed by Metro Nashville Public Schools (MNPS). Services shall be provided in accordance with the Individualized Education Plan ("IEP") of each student. Services will be provided by appropriately licensed, or certified personnel. The Contractor shall implement an IEP program which will meet the unique needs of each child enrolled, with provision for all support materials and services necessary for their education. If the Contractor cannot provide the direct and related services called for in the IEP, the Contractor has the obligation not to accept the student. By accepting the student, the Contractor agrees to provide all services and program components including related services required by the IEP with the following exceptions: transportation to and from school, foreign language and hearing interpreters, vision-, hearing-itinerant services and hearing interpreters.

(Docket Entry No. 169-1, Exh. 1 at GLC0470)(emphasis added).

When he was first enrolled at Genesis, Gilberto was assigned to ride a regular school bus to and from school. According to Ms. Lopez, Gilberto was repeatedly harassed by other students while riding the regular school bus. That harassment took several forms, including stolen items being placed in Gilberto's clothes and backpack for which Gilberto was blamed, Gilberto being thrown down the bus steps on several occasions, and Gilberto being pressured into "throwing gang signs."

On April 10, 2007, Ms. Lopez contacted Metro's customer service hotline to voice her concerns about the treatment that Gilberto was receiving while riding on the school bus. The person who fielded the call recorded the following concerns:

> Parent called very upset and concerned about her child. The parent states her son is being assaulted on the Special Ed bus on a daily basis and he is coming home with bruises from other children assaulting him on the bus. The parent states the driver is not able to keep an eye on the kids and drive the bus and has no control. The request that a bus monitor be added to this bus route [is] not only for her child's safety but also for the other children being assaulted.

3

(Docket Entry No. 166-23 at 3). Ten days after this report, April 20, 2007, a student on Gilberto's bus threatened to shoot Gilberto and his parents. Ms. Lopez claims that she contacted MNPS's transportation and special education departments on approximately five occasions in an effort to have a monitor placed on her son's school bus.

Sometime around this period, Ms. Lopez contacted Linda DePriest ("DePriest"), a MNPS special education coordinator, to see about having a monitor placed on Gilberto's bus, or to have him moved to a smaller bus. During their conversation, Ms. Lopez told DePriest that Gilberto "had been frequently threatened by some of the older students and she was fearful that he was on the verge of a mental collapse." (Ms. Lopez Aff. ¶ 9).

At an Individualized Education Plan ("IEP")[3] meeting for Gilberto held April 17, 2007, Ms. Lopez requested that a bus monitor be placed on Gilberto's bus. However, the IEP, as formulated, did not include a monitor, in spite of Ms. Lopez's expressed concerns. Ms. Lopez signed the IEP as an "IEP Team Member."

When Gilberto enrolled in the Metro school system, Metro reviewed Gilberto's most recent IEP from the Chicago Public School System. The Chicago IEP mandated that Gilberto receive a bus aide as an accommodation for his disabilities.

Following the IEP meeting, Mrs. Adams, on Thursday, April 26, 2007, sent an e-mail to Sandra Burton ("Burton"), who was employed by Metro as a special education bus route coordinator and was responsible for bus assignments and routes. The e-mail stated:

---

[3]IEPs set forth the educational program to be provided to special education students to meet their unique educational needs and describe the educational plan designed to meet those needs. The IEP is reviewed annually in order to identify specific goals and issues and to note any progress from the previous year.

4

> "Gilberto Lopez.; age 9 being picked on a lot by older kids and mother expressed
> great concern in IEP meeting we just had; she wants a 1:1. Is there any way for him
> to be put on Chris Gaines bus since he only has 3-4 students max."

(Docket Entry No. 252-24). In response, Burton asked that Mrs. Adams supply a list of students

who rode on bus driver Christopher Gaines' ("Gaines'") bus. Mrs. Adams supplied a list that

consisted of four students, one of which was Kolby ("Kolby") Harris. Gilberto was transferred to

Gaines' bus on April 29, 2007.

Bus drivers generally receive "information sheets" for students assigned to their buses.

However, a student's behavioral history is not described on these information sheets. Gaines never

received an information sheet for Gilberto.

Gaines also did not receive an information sheet on Kolby, another passenger on the bus to

which Gilberto was assigned. Kolby is ten years older than Gilberto, and was 19 years old at the

time of the events which precipitated the filing of this lawsuit.

**B.  The Incident and its Aftermath**

On May 7, 2007, Gloria Smith ("Smith"), a substitute driver, was driving Gaines's bus.

Smith had no information about the passengers, and no monitor was on the bus. However, the

passengers were filmed by a video camera placed at the front of the bus. The video camera, which

is pointed towards the back of the bus, is a static camera showing both rows of seats.

The videotape, which lasts approximately 20 minutes, shows that on the way home from

school, Gilberto was riding in the front seat on the passenger side, while Kolby was sitting in the

next-to-the-last seat on the driver's side. Gilberto left his seat and went and sat down in the seat next

to Kolby. After Gilberto sat down, Kolby continued a conversation he was having with Smith.

5

Shortly thereafter, it appears that Kolby removed his sweater or some sort of other outer garment. Gilberto then ducked down, towards Kolby's lap.[4] This occurred on several occasions. During this period, Kolby's conversation with Smith ceased. As Gilberto ducked his head down on the last occasion, Kolby began to grunt or moan. Smith (who sounded startled) then asked what was going on, to which Kolby replied that he, Gilberto, was "eating cookies." Gilberto was instructed by Smith to return to his seat at the front of the bus. As Gilberto stood next to the front seat, Smith again asked what was going on. Gilberto said "nothing," and Kolby called out from the back that he (Gilberto) was "eating cookies."

Ms. Lopez and the United States contend that Gilberto was raped in that he was forced to fellate Kolby, and there is much evidence to support that contention. The videotape, while not definitive, certainly suggests as much. Further, Kolby admitted to Susan Sawyer, the Principal of Genesis, that he told Gilberto to perform fellatio on him, and that Gilberto complied. Gilberto told school officials and his parents that he "licked" another student's "wee wee," and told his mother that Kolby had "gone to the bathroom in his mouth," which she understood to mean that Kolby had ejaculated in Gilberto's mouth. Metro and Genesis officials who viewed the video of the incident found that the video depicted inappropriate sexual behavior. Further, as a result of the May 7, 2007 incident, Kolby was criminally indicted on the charge of rape of a child.[5]

For their part, Metro and Genesis point out that the videotape does not clearly establish what happened. They also note that Kolby told his stepmother that he did not assault Gilberto.

_____

[4]The seatbacks on the seats in the preceding row prevent seeing exactly what occurred when Gilberto ducked down.

[5]Kolby was found by the state court to be incompetent to stand trial on the charge.

6

At the end of the afternoon shift on May 7, 2007, Smith went to the transportation department to express her concern that Kolby and Gilberto may have engaged in inappropriate conduct. She was concerned that "something" may have happened because she had noticed that Gilberto's head was below the seat and she observed Kolby "raise up like he was, you know, zipping his pants or whatever." (Smith Depo. at 19-20)

The next day, May 8, 2007, Gwen Sales ("Sales"), a Metro driver supervisor issued a download request for the video file from the digital camera on Smith's bus. Pursuant to Sales' request, Eugenia Roberson ("Roberson"), a Metro safety investigator, downloaded the video that same day.

Burton was the first Metro official to view the videotape. Burton watched the video on May ll, 2007. She reported her concerns to her supervisors, Guy Morgan ("Morgan") and Keith Phillips ("Phillips"), on the morning of May 14, 2007, and Morgan viewed the videotape shortly thereafter. Burton contacted Genesis Academy officials and made arrangements to deliver a copy of the video to those officials on that same afternoon.

When the video was delivered, it was viewed by Mr. and Mrs. Adams, Sawyer, and Tracey DeMoss ("DeMoss"), Metro's bus route coordinator for non-disabled students. After viewing the video on May 14, 2007, Genesis officials contacted Gilberto's parents and told them for the first time about the May 7, 2007 incident.[6]

Kolby was removed from the bus on the afternoon of May 14, 2007, and the Department of Children's Services and police were contacted. Kolby was removed from Genesis on May 15, 2007.

---

[6]MNPS's policy is to immediately notify parents if school officials suspect a child is the victim of inappropriate conduct. MNPS claims that the delay in this case was due to the fact that Roberson encountered technical difficulties with her laptop and with converting the files for copying into a DVD format.

After the May 7, 2007 incident, Gilberto allegedly experienced visual hallucinations and nightmares about Kolby, heard voices telling him to kill his family, defecated on himself and in his bedroom, attempted to cut off his genitals, refused to bathe, and required noise from a television or DVD player to "drown out the voices" so he could fall asleep. MNPS claims that Gilberto had engaged in most of these behaviors before the incident, as reflected by the expert reports of Dr. Warren Thompson ("Dr. Thompson") and Dr. Robert Begtrup ("Dr. Begtrup").[7]

On May 10, 2007, Gilberto assaulted another student on his bus and acted aggressively towards the bus driver, prompting the driver to call the police. A "Six Weeks Summary" issued by Genesis on May 21, 2007 stated that "Gilberto has often refused to do any work. He will completely shut down or try to run away to get out of completing assignments." The summary also stated: "We are seeing inconsistent behavior with Gilberto. At times he is very oppositional and aggressive[.]" (Docket Entry No. 166-7 at GLC 000533).

When Gilberto returned to Genesis for the Fall 2007 semester, he acted "fearful" at school, and periodically indicated that he did not want to ride the bus. On September 19, 2007, Gilberto was removed from Genesis and committed to Youth Villages, a residential treatment facility in Memphis, Tennessee for inpatient mental health treatment.

Gilberto was discharged from Youth Villages on July 14, 2008, but soon after returning home he attempted to set fire to his mother's house because he thought he heard voices saying Kolby "was coming to get him." Gilberto was then committed to the Middle Tennessee Mental Health Institute from July 22, 2008 to August 13, 2008.

_____

[7]On June 7, 2007, Ms. Lopez informed a medical case worker that prior progress remedying some symptoms of Gilberto's disabilities was "all lost" after the May 7, 2007 incident. However, MNPS claims that, according to the expert reports of Drs. Thompson and Begtrup, the May 7, 2007 incident had little effect on Gilberto's well-being when compared to a lifetime of neglect and abuse suffered by Gilberto.

8

## C.  Kolby's History and Record

Prior to the May 7, 2007 incident, Kolby had an extensive and documented history of behavioral problems.  From August 2002 to February 2005, he attended Madison School, a Metro special education school that offered a structured SBI program.

On August 20, 2003, Kolby was disciplined for engaging in a sexual act in the school.  Metro claims that the discipline involved a "consensual sexual act with an age-appropriate female student."

On September 13, 2004, Kolby admitted to having oral sex and sexual intercourse with another student in the girls' bathroom, and stated that he had engaged in intercourse with the same student in the girls' bathroom the week before.  A Suspension Addendum relative to these incidents indicates that Kolby's "behavior is directly related to his disabilities," and notes that similar behavior "[m]ay happen again if he is not supervised." (Docket Entry No. 165-35, GLC 0164 & 0170).  Again, MNPS claims that these acts were consensual and with age-appropriate females.

On September 27, 2004, Madison School established a "Safety Plan" for Kolby that provided as follows:

> HE WILL BE ESCORTED TO THE RESTROOM, NO EXCEPTIONS
>
> HE WILL REMAIN IN THE CLASS HE IS IN UNTIL ALL STUDENTS HAVE MADE A CLASS CHANGE; THEN HE WILL GO TO HIS NEXT CLASS EITHER WATCHED BY AN ADULT OR ESCORTED BY AN ADULT. THIS IS FOR ALL CLASS CHANGES.
>
> HE WILL PARTICIPATE ONCE A WEEK IN A BOY'S GROUP.
>
> HE WILL BE ESCORTED TO THE LUNCHROOM BY AN ADULT WHERE HE IS TO STAY UNLESS AN ADULT GOES WITH HIM.
>
> PLEASE, WE ALL MUST HELP WITH THIS PLAN. IT IS ESSENTIAL WE DO NOT HAVE ANOTHER INCIDENCE WITH KOLBY.

(Docket Entry No. 166-26 at 000564).

9

A Madison Behavior Incident Report dated January 10, 2005, reflects a complaint from a student and parent that Kolby exposed his penis to a student on the bus. The complaining student accused Kolby of saying he was going to "show the new kid my privates" and "do it to him." Kolby was subsequently suspended for ten days, and the discipline codes indicated that the suspension was for "sexual harassment," "intimidation/bullying," and "repeated violations." (Id. at 000557).

Shortly after that incident, on January 14, 2005, Madison required Kolby to sign a "Contract Agreement" which provided, in part:

> - "I will not have ANY type of sexual activity, including sexual touching, remarks, gestures, or writing letters about sex";
>
> - "I will not go anywhere in the building without an adult's permission";
>
> - "I will ask an adult to escort me to the restroom anytime I nee[d] to go";
>
> - "I will follow the bus safety plan at all times"; and
>
> - "I will tell the school if the bus safety plan is not followed."

(Id. at 000645).

The "Bus Safety Plan" established by Metro and which was referenced in Kolby's Contract Agreement mandated the following:

> - The front right hand seat of the bus will be reserved for Kolby Harris;
>
> - No one will sit in the two front left side seats and no one will sit in the second right seat; and
>
> - A large X will be taped to the front four seats to remind students not to sit there.

(Id. at 000644).

10

On January 18, 2005, LuAnn Landrum ("Landrum"), the Principal of Madison, outlined her concerns about Kolby in a Memorandum to Jim Overstreet ("Overstreet"), a District-Level discipline coordinator for Metro. After recounting the incidents that led to Kolby's ten-day suspension, Landrum wrote:

> I am very concerned that we now have this incident involving a much younger child. Several students have stated that they are frightened of Kolby and [redacted]'s mother is perusing [sic] legal action. [Redacted] has filed a police report stating she believes her son may have been sexually molested by Kolby. While I have no evidence of anything happening with [redacted] and Kolby the situation has quickly escalated out of control. I feel it would be in the best interest of all concerned, for Kolby to be placed in another Severe Behavior Intervention Program.

(Id. at 000580). Landrum sent copies of the Memorandum to DePriest and to Sharon Wright ("Wright"), the Executive Director of Metro's Department of Special Education.

On February 4, 2005, Metro conducted a Functional Behavioral Assessment ("FBA") of Kolby. The FBA states that in November 2004 Kolby committed "a series of reported bus incidents of [a] sexual nature including verbal threats to intimidate" and further states that Kolby's "sexual behaviors were determined to be a manifestation of Kolby's handicapping conditions." The FBA also states:

> Mother is aware of these tendencies of Kolby and has requested that he be closely supervised at school . . . . If Kolby is closely supervised at all times these behaviors do not occur. Must escort Kolby everywhere. Having a bus driver driving his bus is NOT adequate supervision.

(Id. 000462).

On February 4, 2005, Kolby was removed from the Madison School and placed in a Homebound Program. In August 2005, Metro enrolled Kolby in a Community Based Transition ("CBT") Program at Whites Creek High School. Kolby was transported to and from the school by his mother.

11

On December 6, 2005, a Suspension Addendum was issued which indicates that Kolby received a ten-day suspension for engaging in sexual activity with a female student on November 30, 2005. The police were called to respond to the incident and the alleged victim was instructed to get a rape kit, but did not do so.

After the November 30, 2005 incident, Metro officials withdrew Kolby from the CBT Program. IEP meetings were held on December 6, 2005 and January 3, 2006, after which it was decided that Metro would attempt to place Kolby at Genesis. In requesting that Genesis accept Kolby as a student, Metro informed Genesis that Kolby had allegedly engaged in sexual intercourse in a bathroom with a female student at Madison School. In fact, the New Student IEP Information Sheet created by Genesis includes the starred notation: "Supervise with girls, sexual assault." (Docket Entry No. 124-5). Kolby enrolled in Genesis on April 3, 2006.

Prior to Kolby's placement at Genesis, as well as shortly after that placement, his mother Terrilyn Harris ("Ms. Harris") requested that Kolby be placed on a bus with only a few students and that those students not be smaller students. Ms. Harris claims that school officials told her that a monitor would be placed on Kolby's bus, and, in fact, a monitor rode on Kolby's bus for the first few weeks of his attendance at Genesis. However, that monitor was a "one-on-one" assistant who was assigned to another student and did not ride the bus after the student's parents decided to drive their child to and from school.

When Metro officials transferred Kolby to Genesis they never disclosed to Genesis the existence of Kolby's prior bus safety plan. However, Metro claims that a bus safety plan was not a part of Kolby Harris' current IEP at the time of his enrollment at Genesis.

On May 4, 2006, a parent called Genesis and told Heather Olson, a social worker, that his daughter had been molested the day before at school. When asked to explain what had occurred,

the father stated that his wife was giving their daughter a bath the previous evening, when the daughter pointed between her legs and said that "K.H. touched her private parts that day and the day before and that it took place in the classroom." (Docket Entry No. 251-41 at 1159).

On December 19, 2006, Jody Baker ("Baker"), Kolby's teacher at Gensis, created a Behavior Intervention Plan for Kolby. Under the "[i]dentify target behavior(s) to be changed," Baker wrote "Inappropriate Sexual behavior." Under the heading "[s]tate the replacement behaviors," Mr. Baker wrote "To refrain from all inappropriate sexual behaviors . . . To interact appropriately with all peers." Baker also wrote, "the behaviors that Kolby usually displays are those that tangible rewards work well with. The one issue inappropriate sexual behavior was more serious and dealt with by isolation and 1:1 supervision (seem to be working very well). The reinforcers and consequences work well with/for Kolby." Genesis claims that the reference to "1:1" meant in the classroom Kolby was required to stay within close proximity to a staff person at all times. (Docket Entry No. 214-31).

Dr. Lyn McRainey ("Dr. McRainey"), who was employed by Metro as a school psychologist, conducted a psychoeducational assessment of Kolby on March 16, 2007. After reviewing Kolby's education file, she observed:

> Kolby has a history of inappropriate sexual behavior. It is not clear whether the etiology of his behavior is cognitive, predatory, the result of suspected early abuse, or some combination of the three. In any case, it is essential that he be closely supervised. Should his sexual behaviors escalate, he may need to get involved with the Rape and Sexual Abuse Center or another such agency.

(Docket Entry No. 124-5 at 14). Although Dr. McRainey made the foregoing observation based upon Kolby's file, she admits that she is not qualified to make any psychological conclusions regarding sexual behaviors, because this is not her area of expertise. Nevertheless, Dr. McRainey testified in her deposition that, in light of the information reflected in her report, she was not

13

surprised to learn that Kolby had sexually assaulted Gilberto because it was the type of behavior that Kolby had exhibited in the past. Metro received Dr. McRainey's assessment on March 27, 2007, approximately six weeks before the incident at issue in this case.

Burton, who had never been informed about Kolby's prior history, testified in her deposition that had she known of that history, she would have been concerned about some risk to the students who rode with Kolby.

**D. Other Incidents on Special Needs Buses and Assignments to Such Buses**

Prior to the alleged rape or assault at issue in this case, several Metro officials had voiced general concerns about the safety of children riding on special needs school buses. For example, DePriest was concerned about the safety of children riding to contract schools on buses without monitors and supervision, based upon conversations she had with parents and others. Those concerns generally related to fighting on the bus, throwing items on the bus and out the bus windows, using profane language, and stealing. She had also heard about an incident of inappropriate touching or sexual activity years before the event at issue in this case.

Burton also was concerned about the safety of the children and bus drivers, particularly as it related to fights which occurred on the buses. Other officials had also generally discussed on occasion the topic of having monitors on the special needs school buses.

On October 5, 2006, Jenna Staehling, a student with disabilities, was allegedly sexually molested by another student with disabilities on a Metro special needs school bus. Suit was filed on her behalf in this Court and styled <u>Staehling v. Metro</u>, Case No. 3:07-797, 2008 WL 4279839 (M.D. Tenn. 2008). After the incident, officials at Metro renewed discussions about screening drivers and placing monitors on school buses carrying special needs children. Some of those discussions were with Pedro Garcia ("Garcia"), the Superintendent of Metro schools. Nevertheless,

14

between the alleged sexual assault of Jenna Staehling on October 5, 2006 and the alleged sexual assault of Gilberto on May 7, 2007, Metro did not hire any bus monitors.

Prior to the May 7, 2007 incident at issue in this case, a compelling factor in the assignment of students with disabilities was the home address of the student. Responsibility for assignments primarily rested with Metro's transportation department, and it was guided by a child's IEP. While bus drivers and transportation officials may have received some information regarding a student's disabilities and behaviors, they were not privy to the child's record. Drivers of special education buses did not receive special training on the disabilities or behavioral tendencies of their passengers, although Mr. Adams testified that he offered to discuss "how to handle our kids" with Metro's bus drivers. Mrs. Adams told Metro officials that bus monitors should be assigned for buses carrying special education students to and from Genesis.[8] In her deposition, DePriest admitted that the combination of a lack of monitor, the absence of screening during the bus assignment process, and insufficient training of bus drivers was a concern because that combination could lead to harm to children with disabilities.

Prior to the May 7, 2007 incident, officials at Genesis occasionally discussed the placement of monitors on the buses transporting children to its school with Metro officials. Some Metro school buses did in fact have monitors, but Metro claims this occurred when a monitor was called for in a student's IEP. An August 6, 2007 memorandum from Phillips to Burton noted that monitors which had been placed on buses serving Murrell School, another SBI program, had "proven to be effective in previous school years." (Docket Entry No. 166-45).

_____

[8]GLC operates a school in Rutherford County, Tennessee that serves special needs students. Those students are supervised on the school buses by bus monitors.

15

Prior to the incident at issue in this case, Educational Assistants ("EA's") from contract schools have ridden on buses to and from contract schools in place of formal monitors, although this did not occur with respect to buses servicing Genesis. After the incident, DePriest contacted Genesis about the possibility of their Associate Teachers riding buses, but Genesis indicated that was not an alternative because those individuals were needed at the school when the students arrived and were needed after the students left to do paperwork and assist with planning for the next day. Further, Genesis was concerned about potential liability since Metro owned and operated the school buses.

Ideally, a school should be provided with each student's cumulative educational file, so that they can have a clear understanding of the student and his profile. However, in practice, schools sometimes did not receive a complete record for students. For example, when Kolby came to Genesis, Genesis claims it was provided with his current IEP and a prior IEP, but neither IEP had a Functional Behavior Assessment and/or Behavior Intervention Plan attached and neither indicated that there was a Functional Behavior Assessment and/or Behavior Intervention Plan in place. Genesis also claims that it did not generally receive a student's cumulative file until some time after the student had actually enrolled at the school, and did not receive Kolby's cumulative file until eight months after he began attending Genesis.[9] By the time it received that file, Genesis claims that it already had a program in place for Kolby which appeared to be meeting his needs.

**E.  Nature of the Claims in this Case**

In her Fourth Amended Complaint, Plaintiff brings claims against Metro and Genesis under 42 U.S.C. §1983, Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12141 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, and

_____

[9]This would still have been four months before the incident at issue in this case.

16

Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681.  She also brings a negligence claim against Metro under the TGTLA, T.C.A. § 29-20-101, *et. seq*., as well as a common law negligence claim against Genesis.   The United States has filed a "Complaint in Intervention" solely against Metro alleging a violation of Title IX.

In her response to Metro's Motion for Summary Judgment, Plaintiff has withdrawn some of her claims based upon the arguments raised by Metro and the applicable case law.  Specifically, Plaintiff has withdrawn her Equal Protection Clause and retaliation claims under Section 1983, her Rehabilitation Act claim, and her ADA claim.  (Docket Entry No. 223 at 12 & 29).  This leaves for resolution Plaintiff's Fourteenth Amendment Substantive Due Process claims under 42 U.S.C. § 1983, her negligence claims (both common-law and under the TGTLA), and the claims under Title IX brought by Plaintiff and Plaintiff-Intervenor United States.

## II.  <u>APPLICATION OF LAW</u>

As indicated at the outset, there are various Motions pending before the Court, including potentially dispositive Motions for Summary Judgment.  The Motions will be considered under separate sub-headings.

### A.  <u>Motions for Summary Judgment and Related Motions</u>

Plaintiff and Metro have filed cross-motions for summary judgment with respect to all of the claims set forth in the Fourth Amended Complaint.  Plaintiff-Intervenor United States has filed a Motion for Summary Judgment with respect to its claim under Title IX and Metro has filed a cross-motion for summary judgment on that claim.  Defendant Genesis has moved for summary judgment on the claims specifically asserted against it.

Because of the similarities between some of the Motions, the Court will address each of the claims set forth in the Fourth Amended Complaint which the Plaintiff has not withdrawn.  First,

17

however, the Court will address the motions which were filed relating to the Summary Judgment Motions, set forth the appropriate standard of review, and resolve Metro's argument that some or all of the claims should be dismissed for failure to exhaust administrative remedies.

### 1. <u>Motions Related to the Summary Judgment Filings</u>

The parties have filed numerous Motions in conjunction with the Motions for Summary Judgment, including motions for oral argument (Docket Entry Nos. 218 and 225), motions to file oversized Memorandums (Docket Entry Nos. 204 and 246), motions seeking to strike additional statements of undisputed fact (Docket Entry Nos. 257, 259 and 266), and motions for leave to file additional responsive Memorandums.

The Court will deny the request for oral argument, as the Court finds that oral arguments will not aid the Court in its resolution of the Motions for Summary Judgment. The parties have filed hundreds of statements of alleged undisputed facts, hundreds of pages of briefing, and thousands of pages of documents in relation to the Motions for Summary Judgment. Those filings are more than sufficient to assist the Court in deciding the Motions for Summary Judgment.

The Motions to Strike additional statements of undisputed facts will be denied. Those statements amplify the issues and, for the most part, were filed in an effort to contradict statements made in the opponents' statements of undisputed facts. The Court will grant the requests to file oversized Memorandums and additional responsive memorandums, since those filings are of assistance in resolving the summary judgment motions.

### 2. <u>Standard of Review</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000).

18

The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### 3. Exhaustion of Administrative Remedies

As a preliminary matter, Metro asserts that most, if not all, of Plaintiff's claims should be dismissed for failure to exhaust administrative remedies under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et. seq*.  Plaintiff argues that the IDEA is inapplicable in this case and that, even if it were applicable, exhaustion of administrative remedies would have been futile.

The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services[.]" 20

19

U.S.C. § 1400(d)(1)(A).  The IDEA is designed to insure that children with special needs receive

a free appropriate public education ("FAPE"), with the primary mechanism being the development

of an IEP.  <u>Mallory v. Knox County Sch. Dist.</u>, 2006 WL 3484015 at *2 (E.D. Tenn. 2006).

The IDEA contains procedural safeguards, which have been described as follows:

> To effectuate the rights created by the Act, states must establish procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education[.]" 20 U.S.C. § 1415(a).  One of those procedures is the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6).  Any complaints must be given an impartial due process hearing, 20 U.S.C. § 1415(f), and if necessary a review by a higher state agency. 20 U.S.C. § 1415(g).  Those persons dissatisfied with the results of the administrative hearing and appeal may file suit in state or federal court for judicial review of the administrative decision.  However, plaintiffs must exhaust their administrative remedies before filing a civil action to enforce their rights under the IDEA.

<u>Id</u>. at *4.  The IDEA also contains an exhaustion requirement by providing:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).

In this case, Plaintiff brings no claims directly under the IDEA and seeks compensatory

damages which are not available under the IDEA.  Regardless of how the claim is couched, a claim

which relates directly to a student's access to a FAPE is required to be exhausted.  <u>Long v. Dawson

Springs Indep. Sch. Dist.</u>, 197 Fed. Appx. 427, 434 (6th Cir. 2006).  Further, a claims for damages,

standing alone, does not excuse a plaintiff from exhausting her administrative remedies.  <u>Covington</u>,

205 F.3d at 916.  Instead, "'when a plaintiff has alleged injuries that could be redressed to any

20

degree by the IDEA's procedures and remedies, exhaustion of those remedies is required.'" <u>S.E.</u> <u>v. Grant County Bd. of Educ.</u>, 544 F.3d 633, 642 (6th Cir. 2008)(citation omitted).

While exhaustion of claims which relate to a FAPE are generally required to be exhausted, "parents may bypass the administrative process where exhaustion would be futile or inadequate." <u>Honig v. Doe</u>, 484 U.S. 305, 327 (1988). In this case, Plaintiff alleges that it would have been futile for her to exhaust any administrative remedies. The Court finds merit to that contention.

The IDEA set forth an "elaborate scheme" in its administrative remedies, <u>Covington</u>, 205 F.3d at 917, and the process is "time-consuming," <u>Honig</u>, 484 U.S. at 326. Moreover, the IDEA is "not well-suited to remedying past instances of physical injuries" or providing relief for "retrospective injuries." <u>Covington</u>, 205 F.3d at 918. Thus, it is futile for a plaintiff to have to exhaust administrative remedies where "the condition creating the damage has ceased and there is no equitable relief that would make [plaintiff] whole." <u>Id</u>.

In this case, Ms. Lopez asserts that she was provided notice of her procedural rights by Metro less than a month before Gilberto was sexually assaulted and she again requested that a monitor be placed on Gilberto's bus only ten days before the incident at issue. Given this timeframe, it would have been futile for her to try to exhaust administrative remedies, and pursuit of those remedies certainly would not have resolved the issue about monitors being on the bus in time to prevent the injuries about which she now complains. Moreover, Ms. Lopez seeks to redress injuries resulting from Gilberto's alleged rape, which is a "noneducational injur[y]" that does not require exhaustion. <u>M.Y. v. Special Sch. Dist. No. 1</u>, 519 F.Supp.2d 995, 1002 (D. Minn. 2007). <u>See</u>, <u>Padilla v. Sch. Dist No. I</u>, 233 F.3d 1268, 1274 (10th Cir. 2000)(exhaustion under IDEA was not required where plaintiff sought redress for fractured skull and other physical injuries since "prospective educational benefits" could not "possibly begin to assuage Plaintiff's severe physical,

21

and completely non-educational, injuries"); <u>Bowden v. Dever</u>, 2002 WL 472293 at *5 (D. Mass. 2002)("claim for violation of bodily integrity" under Section 1983 was not subject to exhaustion under the IDEA because the "administrative process would provide little benefit").

### 4. **Section 1983 Claims**

Plaintiff claims she is entitled to summary judgment because Defendants deprived Gilberto of rights guaranteed him under the Fourteenth Amendment because they acted with deliberate indifference under color of state law in violation of Section 1983. Plaintiff also claims that Metro is liable under the due process clause of the Fourteenth Amendment under the "state created" danger theory and Section 1983 for its failure to adequately train its bus drivers.

#### (a) *State Actors and Genesis*

To prevail on a Section 1983 claim, a plaintiff must show the deprivation of a right protected by the Constitution or laws of the United States that was caused by a person acting under color of state law. <u>Boykin v. Van Buren Twp.</u>, 479 F.3d 444, 451 (6th Cir. 2007). While Metro is a state actor for purposes of Section 1983, the same cannot be said of Genesis in light of the Supreme Court's decision in <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830 (1982).

In <u>Rendell-Baker</u>, the Supreme Court held that a private school which taught special needs children and received 90 percent of its funds from the state and was extensively regulated by the state was not a state actor within the meaning of Section 1983. The Court drew on its earlier decision in <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1011 (1982) which held that a private nursing home did not engage in state action despite its extensive regulation by, and receipt of 90 percent of its income from, the state, and wrote:

> The school, like the nursing home, is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do

22

not become acts of the government by reason of their significant or even total engagement in performing public contracts.

Id. at 840-41. While the Supreme Court recognized that educating maladjusted high school students is a public function, it explained that "the relevant inquiry is not simply whether the private group is serving a 'public function' . . . [but] whether the function performed has been 'traditionally the exclusive prerogative of the state.'" Id. Since education is not an exclusive governmental function, there was no symbiotic relationship or sufficiently close nexus between the private school and the state such that the private school could be characterized as a state actor for purposes of § 1983.

Based upon Rendell-Baker, the Third Circuit in Black v. Indiana Area Sch. Dist., 985 F.2d 707 (3d Cir. 1993) found that a bus company which provided school buses under contract to the state was not a state actor under Section 1983 in a suit brought on behalf of children who had been sexually molested on a school bus. In reaching that conclusion, the court wrote:

> It is clear from Rendell-Baker that a state contractor and its employees are not state actors simply because they are carrying out a state sponsored program and the contractor is being compensated therefor by the state. Nor does the fact that the activity being performed is a public function render the contractor and its employees state actors. For the nature of the contractor's activity to make a difference, the function performed must have been "traditionally the exclusive prerogative of the State."

Id. at 710 (internal citation omitted). The Court in Black concluded that the bus company and its employees were "indistinguishable" from the private school and its employees in Rendell-Baker.

Given Rendell-Baker and its progeny, the Court finds that Plaintiff has failed to establish that Genesis was a state actor for purposes of her Section 1983 claims in this case, notwithstanding the fact that Genesis provided its services to, received funding from, and was regulated by the state. This is particularly so since the incident complained of occurred on a bus which was owned and operated by Metro, not Genesis.

23

### (b) *Due Process and State-Created Danger Claim Against Metro*

Plaintiff claims that Gilberto's Due Process rights were violated because Metro's "affirmative acts increased the risk of harm." Plaintiff seeks to hold Metro liable for this violation under the state-created danger theory.

As a general proposition, governmental entities are not liable for injuries sustained by private citizens as a result of the citizen's own or another private citizen's conduct. Deshaney v. Winnebago Cty Dept. of Soc. Servs., 489 U.S. 189, 196 (1989). However, a "state-created danger" is an exception to this general rule because it allows governmental actors to be held liable for the conduct of private actors.

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." Kallstom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998). The theory is that "'[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snakepit.'" Id., quoting, Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982).

In order to establish a state-created danger claim, a plaintiff must show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003). With regard to the affirmative act, where there is "opportunity for reflection and unhurried judgment," plaintiff must show deliberate indifference, meaning that the state actor was "'aware of facts from which the

24

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Arledge v. Franklin County, 509 F.3d 258, 263 (6th Cir. 2007)(citations omitted).

In the state-created danger context, the critical issue is whether government officials "did anything 'affirmative' to 'embolden' the person causing harm to another." Brooks v. Knapp, 212 Fed. Appx. 402, 406 (6th Cir. 2008)(citing, Jones v. Reynolds, 438 F.3d 685, 703 (6th Cir. 2006)). Thus, failure to act, as opposed to affirmative conduct, does not cause a "state-created danger" to arise. Id. However, because it may be difficult for a court to distinguish between action and inaction, the Sixth Circuit has refined the test by focusing on "'whether [the victim] was safer before the state action than he was after it." Cartwright, 336 F.3d at 493. If a plaintiff cannot identify conduct by the state actor which either created or increased the risk of harm to which plaintiff was exposed, then the conduct is said to "fall[] on the inaction side of the line." Koulta v. Merciez, 477 F.3d 442, 446 (6th Cir. 2007)(collecting cases). Likewise, if a victim is not identifiable at the time of the state action or inaction, a claim under the state-created danger exception will not apply. Id. at 447.

In this case, Plaintiff has presented evidence from which a reasonable jury could conclude that Metro engaged in conduct which placed Gilberto specifically at risk and created or increased a risk of harm to him. Taken in a light most favorable to her, there is some evidence which supports her theory that Metro affirmatively placed Gilberto, a young and vulnerable boy, on a special needs school bus with a nineteen year old student whom Metro knew to have a history of inappropriate sexual behavior, including sexual intercourse with female students and what can be characterized as predatory acts on young boys, including exposing his penis and making threats that he was "going to do it" with the "new kid." Plaintiff alleges Metro did so in spite of her plea that her son be placed on a school bus with a monitor, and Ms. Harris's pleas that her son Kolby not be placed on a school

bus with young children.  Instead of heeding such pleas, Kolby was placed on a school bus where he had relatively free reign, even though he had previously been under a Bus Safety Plan for his prior assault which was meant to insure that he be isolated from other children.  Even after the alleged rape, Metro allowed Gilberto and Kolby to ride the same bus for another week.  The Court finds that a jury could conclude from the evidence that Gilberto was less safe after Metro assigned him and Kolby to ride the same bus.

A jury could also conclude that Metro acted with the requisite culpability.  Its decision to place Kolby and Gilberto on the same bus was not a hurried or a split-second decision and, therefore, the standard to be used is deliberate indifference.  See, McQueen v. Beecher Comm. Sch., 433 F.3d 460, 469 (6th Cir. 2008)(teacher's decision to leave some students in classroom while taking other students to computer classes was not "a split-second decision," unlike decisions made by police officers in a shoot-out or high-speed vehicle chase).  Deliberate indifference has been equated with subjective-recklessness and can "'be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it.'" Id. (citation omitted).

The evidence construed in Plaintiff's favor could lead a jury to conclude that Metro had to have known of the obvious risk of Kolby potentially assaulting another student on a school bus without a monitor or some sort of special safety precautions.  Such evidence includes, but is not limited to the following:

• On August 20, 2003, Kolby was disciplined for engaging in a sexual act in his school.

• In September 2005, Kolby was suspended for having oral sex and sexual intercourse with a student in the girls' bathroom.  This prompted a safety plan which required that he be escorted by an adult while on school grounds.

• In January 2005, Kolby was suspended again for exposing his penis to a student on the school bus and telling the student that he was going to show the "new kid" his "privates" and "do it" to him.  This prompted his Principal to write a memo  in which

26

she expressed great concern because the incident involved a "much younger child" and students were afraid of Kolby.

• In January 2005, a bus safety plan was implemented which required Kolby to sit in a designated spot on the bus so that he would be away from other students and in view of the driver and with no other children seated near him.

• Kolby was suspended again for ten days in December 2005 for having engaged in sexual activity with another student.

• In May 2006, Kolby was alleged to have touched the "private parts" of yet another student.

• At an IEP meeting on April 17, 2007, Plaintiff requested that a bus monitor be placed on Gilberto's bus.

Despite all of these events, as well as Ms. Harris' request that Kolby be placed on a bus with a monitor, or at least on a bus with no small children, and Plaintiff's repeated request that Gilberto be placed on a bus with a monitor, Kolby was placed on the same bus as Gilberto. A jury could determine from these facts and circumstances that Metro was deliberately indifferent or subjectively reckless because of the potential risk of harm to Gilberto.

In reaching the foregoing conclusion, the Court is aware of Metro's heavy reliance upon this Court's opinion in Staehling. While that case involved a sexual assault by one special education student on another special education student on a school bus designated for special education students, the alleged perpetrator in that case was not nineteen years old and did have Kolby's record of sexually activity and abuse of younger students.. Quite the contrary, the evidence showed only that the perpetrator in Staehling had once kissed his victim weeks before the incident, but that incident was only reported to the school bus driver. While there had been previous generalized complaints about misconduct on special needs school buses and a "vanilla letter" from the Department of Education about assaults on such buses, those things "did not portend the type of

27

harassment that is alleged to have occurred in this case some eight years later." <u>Staehling</u>, 2008 WL 4279839 at *10. <u>Staehling</u> is factually inapposite.

While Plaintiff has submitted facts which present questions for the jury, she has not submitted evidence which is so one-sided as to obviate the need for trial. In this regard, genuine issues of material fact exist, including, among others, whether Gilberto was in fact sexually assaulted, whether Gilberto was placed at a high risk because he was assigned to a bus with few students which included a nineteen year old boy with a record of sexual activity with other students, and whether Kolby engaged in sexual contact with younger boys, or only that he showed his penis to another male student. Therefore, there are genuine issue of material fact which exist as to whether Metro was actually deliberately indifferent.

For these reasons, summary judgment will not be granted to either Plaintiff or Metro on their Section 1983 claims based on deliberate indifference or the "state created danger" theory.

### (c) *Failure to Train Claim Against Metro*

Plaintiff also alleges that Gilberto's due process rights under the Fourteenth Amendment were violated by Metro's alleged failure to properly train its bus drivers. This claims fails for several reasons.

"[T]here are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." <u>City of Canton v. Harris</u>, 489 U.S. 378, 387 (1989). Such liability may arise only where the governmental entity is deliberately indifferent by not training its employees adequately to address an obvious need. <u>Beard v. Whitmore Lake Sch. Dist.</u>, 244 Fed. Appx. 607, 611 (6th Cir. 2007). "Before a school district can be held liable for inadequate training, a plaintiff must show that (1) the district's training was inadequate for the tasks that the employees performed,

28

(2) the inadequacy was the result of deliberate indifference, and (3) the inadequacy was 'closely related to' or 'actually caused' the injury at issue." Id.

In this case, Plaintiff offers no definitive proof of how the bus driver's alleged lack of training either caused or contributed to the incident that is the subject of this lawsuit, or how any additional training could have prevented it. While the Supreme Court in City of Canton explained that, in some circumstances, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that policymakers of the city can reasonably be said to have been deliberately indifferent to the need" if those policymakers do not provide the "obvious" training, id., 489 U.S. at 390, Plaintiff offers no proof from which this Court or a jury could determine that a need for some sort of further training for school bus drivers was "obvious."

Plaintiff also fails to show that Metro failed to act in response to "'repeated complaints of constitutional violations by its officers'" which would establish a pattern, particularly in light of the fact that Metro's actions must be viewed "*ex ante,*" and not "*ex post.*" Beard, 244 Fed. Appx. at 612 (citation omitted). Moreover, Plaintiff has failed to show that the failure to train was a factor in the alleged rape committed by another student. See, Worthington v. Elmore County Bd. of Educ., 160 Fed. Appx. 877, 822 (11th Cir. 2005)(summary judgment was appropriate where alleged assault was committed by a student on a school bus and there was no evidence the victim sought the help of the bus driver or otherwise did anything to get the attention of the bus driver).

### 5. Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In Davis

29

v. Monroe County Bd. of Educ., 526 U.S. 629 (1999), the Supreme Court was presented with a peer-on-peer sexual harassment claim under Title IX.   In granting certiorari, the Supreme Court aimed "to resolve a conflict in the Circuits over whether, and under what circumstances, a recipient of federal education funds can be liable in a private action for damages arising from student-on-student sexual harassment[.]" Id. at 637.  Moreover, the Supreme Court was called upon to "determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." Id. at 638.

After reviewing the legislative history of the act and its prior rulings, the Supreme Court held that a school could be liable for peer-on-peer sexual harassment only if the school was deliberately indifferent.  That is, schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650.  Liability is cabined by the deliberately indifferent standard since a school is only liable for acts of student-on-student harassment "where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id. at 648.

"To establish a prima facie case of student-on-student sexual harassment, the plaintiff must demonstrate each of the following elements: (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment." Patterson v. Hudson Area Sch., 551 F.3d 438, 444-45 (6th Cir. 2009).  As explained below, the Court

finds there are unresolved material questions of fact which exist with respect to each of these elements, making summary judgment for the Plaintiff, the United States, and/or Metro inappropriate.

### (a) *Severe, Pervasive and Objectively Offensive Sexual Harassment*

With regard to the first prong of a *prima facie* case, the Supreme Court in <u>Davis</u> stated that "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." <u>Davis</u>, 526 U.S. at 651. In this case, Plaintiff and the United States assert that this prong is met because Gilberto was raped and thereafter his educational experience suffered as a result of the trauma he endured.

Most courts which have addressed the issue have concluded that even a single incident of rape is sufficient to establish that a child was subjected to severe, pervasive, and objectively offensive sexual harassment for purposes of Title IX. <u>See</u>, <u>e.g.</u>, <u>J.K. v. Arizona Bd. of Regents</u>, 2008 WL 4446712 at * 12 (D. Ariz. 2008); <u>Kelly v. Yale Univ.</u>, 2003 WL 1563424 at *3 (D. Conn. 2003); <u>Doe v. Dallas Indep. Sch. Dist.</u>, 2002 WL 1592694 at **6-7 (N.D. Tex. 2002); <u>but</u> <u>see</u>, <u>Ross v. Mercer Univ.</u>, 506 F.Supp.2d 1325, 1358 (M.D. Ga. 2007). The leading case for this proposition appears to be <u>Soper v. Hoben</u>, 195 F.3d 845 (6th Cir. 1999), wherein the Sixth Circuit addressed a situation in which a mentally impaired elementary school student alleged that two students fondled her breasts and vagina in the classroom and on the school bus, and that a third boy raped her. The court stated that "[w]ith respect to the first prong of the <u>Davis</u> test," evidence that plaintiff was raped "obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [plaintiff] of access to the educational opportunities provided by her school." <u>Id</u>. at

31

854-55. Tellingly, the court did so without compelling plaintiffs to demonstrate a causal link between the sexual harassment and a specific denial of access to educational opportunities.

In this case, there is evidence to support Plaintiff's and the United States' position that Gilberto was forced to perform fellatio on Kolby and that this would constitute rape of a child in violation of T.C.A. § 39-13-522(a). However, this evidence is not definitive and is challenged by Metro. As Metro points out, the videotape of the incident is not conclusive and Kolby told his mother that he did not assault Gilberto, even though he told school authorities the opposite. Given that this Court cannot weigh the evidence on summary judgment, the Court cannot say, as a proven fact, that Gilberto was raped and, as a consequence, cannot say, as a matter of law, that he was subjected to severe, pervasive and objectively offensive sexual harassment that deprived him of educational opportunities because of that rape.

As an alternative, Plaintiff and the United States argue that the post-traumatic stress Gilberto allegedly experienced as a result of the May 7, 2007 incident diminished the quality of his educational experience at Genesis so severely that ultimately Gilberto was taken out of school and institutionalized to receive treatment. In this regard, Plaintiff and the United States point out that after the incident, Gilberto experienced hallucinations and nightmares about Kolby, heard voices, defecated on himself, attempted to cut off his genitals, refused to bathe, required background noise in order to sleep, and tried to avoid riding the school bus. They claim such trauma diminished the quality of his educational experience as evidenced by the fact that reports from Genesis after the incident indicated that Gilberto often refused to do work, was inconsistent and sometimes aggressive, and that he acted "fearful" when he returned for the start of the Fall 2007 semester. On September 19, 2007, Gilberto was removed from Genesis and committed to Youth Villages where

32

he stayed for several months, only to resume his destructive activities (such as attempting to set fire to his mother's house) upon his release.

While this Court agrees with Plaintiff and the United States that withdrawal from school is a concrete and negative effect on the victim's education, see, S.G. Rockford Bd. of Educ., 2008 WL 5070334 at *4 (N.D. Ill. 2008)(collecting cases) and while Plaintiff and the United States have submitted substantial evidence suggesting a temporal link between the May 7, 2007 incident and Gilberto's difficulties at school, Metro has submitted other evidence which it alleges show that Gilberto's actions at school were manifestations of serious problems he suffered before the incident. In this regard, Metro has submitted expert reports from Dr. Bergtrup, a psychiatrist, and Dr. Thompson, a clinical psychologist to support its position.

In his expert report, Dr. Bergtrup opines that even before the May 7, 2007 incident, Gilberto had several psychiatric conditions, including Post-Traumatic Stress Disorder ("PTSD") and disruptive behavior disorder. Gilberto also had experienced hallucinations and had a history of neglect and emotional and physical abuse by various adults. Dr. Bergtrup concluded that the "alleged trauma in May of 2007 does not appear to meet the criteria for severe trauma," so as to support the conclusion that Gilberto developed acute PTSD from the incident. (Dr. Bergtrup Report at 3). Dr. Bergtrup also links Gilberto's placement in the residential treatment center in October 2007 to things which occurred after, and were unrelated to the bus incident, including his sister's disclosure of sexual abuse, Gilberto jumping from a second story window after being locked in a room by a babysitter who had held a knife to his sister's throat, and an intrusive physical exam. In short, Dr. Bergtrup opines that "[t]he record does not establish that the incident in May of 2007 worsened Gilbert's underlying psychiatric state, diagnoses and symptoms," and, further, "[t]he hospitalization and residential treatment after May of 2007 were not required or caused by the

33

incident in May of 2007," but instead "were made necessary because of Gilbert's unstable home environment and preexisting psychiatric diagnoses." (Id. at 5-6).

Like Dr. Bergtrup, Dr. Thompson finds little correlation between what happened to Gilberto after May 2007 and what happened on May 7, 2007. According to Dr. Thompson, even before the incident, Gilberto exhibited sexually inappropriate behavior, aggression, suicidal and homicidal thoughts, fire-setting, and self-injurious behavior. Dr. Thompson concludes his report with the following observations:

> It is my belief that there is no clear evidence which shows a causal relationship between Gilbert's current symptoms and the bus incident. The incident is but one in a vast array of horrendous life events which have contributed to this child's emotional difficulties.
>
> I do not believe that the bus incident markedly worsened Gilbert's pre-existing psychiatric history. To sum up, if I was Gilbert's treating psychologist and I was aware of his entire history, I would devote no more than 5% (probably less) of our time dealing with the bus incident and at least 95% dealing with his many other issues. Furthermore, if you omit the bus incident from Gilbert's history, the subsequent hospitalizations and treatments (including his need for residential care) were predictable and would most likely have occurred anyway, just from the standpoint of his life events, including his unstable home life, mistreatment by caregivers (possibly including sexual abuse), rejection by the man he thought was his father, and separation from his mother from ages 4 to 8.

(Dr. Thompson Report at 5-6).

Clearly the record in this case is not susceptible to one interpretation. Questions of fact exist on the issue of whether Gilberto was in fact raped, as well as the issue of whether his later difficulties in school were linked to the May 7, 2007 incident.

### (b) *Knowledge of a Substantial Threat of Sexual Harassment*

As indicated, the Supreme Court in Davis held that for a school to be liable for student-on-student harassment, it must have actual knowledge of the harassment. Metro claims it cannot be held liable because there were no reports of Kolby bullying or harassing Gilberto.

Recently, this Court discussed the actual knowledge requirement of <u>Davis</u> in <u>Staehling</u> and wrote:

> Post-<u>Davis</u>, some courts have held that, given the limitations on liability under Title IX, a school must be aware that a particular individual was subjected to a sexually hostile environment or that a particular individual was the perpetrator of sexual harassment. The more accepted view, and the one this Court adopts, is that, to be liable, "'the institution must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.'" <u>Folkes v. New York College of Osteopathic Med.</u>, 214 F.Supp.2d 273, 283 (E.D.N.Y.2002)(citation omitted); <u>see</u>, <u>Johnson v. Galen Health Inst. Inc.</u>, 267 F.Supp.2d 679, 687 (W.D. Ky. 2003)(collecting cases).

<u>Staehling</u>, 2008 WL 4279839 at *10. This is because, as pointed out in <u>Staehling</u>, "[t]he <u>Davis</u> court did not limit Title IX liability to a federal education funding recipient's knowledge of, and deliberate indifference to, the alleged harassment of a <u>particular</u> <u>individual</u>, but instead contemplated that Title IX claims could be based on the recipient's knowledge of, and deliberate indifference to, a <u>particular harasser's</u> conduct in general." <u>J.K. v. Arizona Bd. of Regents</u>, 2008 WL 4446712 at *14 (D. Ariz. 2008); <u>see</u>, <u>Williams v. Bd. of Regents of the Univ. Sys. of Georgia</u>, 447 F.3d 1282, 1293 (11th Cir.2007); <u>Escue v. No. Oklahoma College</u>, 450 F.3d 1146, 1153 (10th Cir.2006).

In this case, a reasonable jury could conclude that Metro had knowledge of the proclivities of Kolby sufficient to hold it liable for his alleged actions in this case. It is undisputed that prior to the incident in this case, Kolby engaged in sexual activity with other students. While Metro downplays these events as "consensual" and "age appropriate," it cannot ignore the fact that Kolby's behavioral history was not limited to supposedly innocuous consensual sex. Quite the contrary, in November 2004, Kolby exposed himself to a ten-year-old male student while riding on a school bus. Additionally, Kolby threatened to show another student his "privates" and compel that student to "do it to him" on a school bus. In fact, Kolby's abusive conduct towards other students earned him a special designated seat on the school bus up front opposite the bus driver which was segregated

35

from the other students on the bus by empty adjacent seats all around. These prior episodes, coupled with Kolby's admitted sexual activity, make it clear that an alleged rape of a student by Kolby on a Metro school bus was certainly possible.

A jury could also conclude that Genesis had knowledge of Kolby's proclivities and Gilberto's vulnerability. The intake sheet at Genesis indicated that Kolby needed to be supervised around girls because of prior sexual assaults. The December 16, 2006 Behavior Intervention Plan indicated that Kolby's "sexual behavior" was a "serious" concern which was best "dealt with by isolation and 1:1 supervision." Four months before the incident, Genesis received Kolby's cumulative file which substantiated his past misconduct. While at Genesis, Kolby engaged in at least two instances of sexual misconduct. Genesis also knew that Ms. Lopez had requested a monitor be provided to ride on the school bus and she was very concerned that her son was forced to ride on a bus without one because of his conditions and the harassment he received. Genesis also requested that Gilberto be transferred to Gaines' bus which was smaller and, in doing so, knew that Kolby rode Gaines' bus without a monitor.

Metro also claims that in order for it to be liable, the proof would have to show that an official with authority to address the problem was informed about the situation. In this regard, Metro points out that "[c]ourts have specifically found that school bus drivers, teachers and custodians were not appropriate persons under the statute because they do not have authority to terminate or suspend the offending individual." (Docket Entry No. 175 at 26). While that is correct as a legal proposition, it is inapplicable in this case.

The record reflects that after the bus incidents in November 2004, Landrum, Kolby's principal at the time, decided to suspend Kolby for ten days and listed the discipline codes as "harassment," "intimidation/bullying," and "repeated violations." At a subsequent IEP meeting

36

between Metro and Kolby's parents, a bus safety plan was put in place which required Kolby to sit in the front seat and prevented other students from sitting in nearby seats. In January 2005, Landrum wrote Overstreet, a district level discipline coordinator, asking that Kolby be transferred to another SBI placement, specifically because of these incidents and the concern that the most recent incident "involv[ed] a much younger child." (Docket Entry No. 166-26 at PO-000580). This is simply not a situation where only a teacher, or bus driver, or custodian had knowledge about a potential problem with Kolby.

### (c) *Deliberate Indifference to Sexual Harassment*

In <u>Davis</u>, the Supreme Court held that for a school district to be liable under Title IX, it must be shown that it was deliberately indifferent to known sexual harassment. A school is deemed "'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Davis</u>, 526 U.S. at 648. The Sixth Circuit has described the deliberate indifference standard under Title IX as follows:

> The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." <u>Davis</u>, 526 U.S. at 648-649, 119 S.Ct. 1661. The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." <u>Id</u>. at 648, 119 S.Ct. 1661. The standard does not mean that recipients must expel every student accused of misconduct. <u>See id</u>. Victims do not have a right to particular remedial demands. <u>See id</u>. Furthermore, courts should not second guess the disciplinary decisions that school administrators make. <u>See id</u>

<u>Vance</u>, 231 F.3d at 260.

In this case, Metro argues that it is entitled to summary judgment because it was not deliberately indifferent once it learned of the alleged assault. To the contrary, it undertook to investigate the matter on its own, without any prompting from police or parents. Once the video was

37

downloaded and viewed, Burton reported her concerns to her supervisors who, in turn, shared the video with Genesis officials. The same day that Burton's supervisors viewed the video, Kolby was removed from the bus and the Department of Children's Services was called and the police were immediately contacted. Metro claims that it did not ignore the incident, try to cover it up, or simply warn Kolby not to act in that manner again.

While such evidence might be viewed as actions which do not amount to deliberate indifference, a jury could conclude otherwise from other evidence in the record. After all, the incident occurred on May 7, 2007, but Gilberto's parent was not apprised of the situation until a week later. In the interim, Gilberto road the same bus as Kolby, rasing the possibility that a second alleged rape could occur at a time when Metro should have had knowledge of a potential sexual assault on the same school bus.

Moreover, Metro's argument focuses on the actions it took after the incident occurred. However, "Title IX liability can flow from two 'harassment' time periods: (a) when a school exhibits deliberate indifference, <u>before</u> a harassing attack on a student by a fellow student, in a way that makes the student more vulnerable to the attack itself; or (b) when a school exhibits deliberate indifference <u>after</u> an attack, that causes a student to endure additional harassment." <u>Snethen v. Bd. of Public Educ. for City of Savannah</u>, 2008 WL 766569 at *2 (S.D. Ga. 2009); <u>see</u>, <u>Simpson v. Univ. of Colorado</u>, 500 F.3d 1170, 1173 (10th Cir. 2007)(summary judgment in Title IX case inappropriate where claim was that coach failed to adequately supervise high school recruits because even before female students were sexually assaulted "there were a variety of sources of information suggesting the risks that sexual assault would occur if recruiting was inadequately supervised"); <u>Zamora v. North Salem Central Sch. Bd.</u>, 414 F.Supp2d 418, 425 (S.D.N.Y. 2005)(<u>Davis</u> implied that prior complaints of others subjected to harassment may be considered when judging the response of a

school board).  In other words, a school district can "be liable for acting with deliberate indifference" if a plaintiff "demonstrate[s] by a preponderance of the evidence that the School District had actual knowledge of prior facts to which it responded unreasonably." Williams v. Paint Valley Local Sch., 400 F.3d 360, 364 (6th Cir. 2005).

In this case, there is a factual question as to whether Metro was deliberately indifferent.  The record reflects that Kolby had a well-established pattern of sexual misconduct which was known by a cross-section of individuals at Metro including its teachers, administrators and IEP team members, as well as administrators and others at Genesis.  When Kolby was at Madison school, Metro officials instituted a restrictive school safety and bus safety plan to ensure that Kolby did not interact with other students outside the immediate presence of an adult monitor.  Metro subsequently placed Kolby in Genesis where he was closely supervised.  However, no comparable structure or supervision was in place with regard to Kolby riding the school bus to and from Genesis. Nevertheless, Gilberto, a much younger and much smaller boy, was placed on the bus with Kolby at the request of Genesis.

It will be for the jury to determine whether the actions of Metro and/or Genesis in requesting and/or allowing Kolby to ride on a school bus with other and younger special needs children without a monitor or without a safety plan which isolated Kolby from other passengers amounted to deliberate indifference under Title IX.

### 6. Negligence Under the Common Law and TGTLA

To establish common-law negligence, Plaintiff  must prove: (1) a duty of care owed by defendant to plaintiff; (2) conduct falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause. McClung v. Delta Square Ltd. P'ship, 937 S.W.2d 891, 894 (Tenn. 1996).  The same elements apply

to a claim of negligence under the TGTLA.  See, Britt v. Maury Cty. Bd. of Educ., 2008 WL 4427190 at *3 (Tenn. Ct. App. 2008).  The determination of negligence claims involves mixed questions of law and fact:

> The existence and scope of the defendant's duty is exclusively within the court's domain. . . .  However, whether the defendant breached its duty and whether the breach proximately caused the injury are generally questions decided by the trier of fact. . . .  These questions become questions of law only when the facts and inferences drawn from the facts permit reasonable persons to reach only one conclusion. . . .

Timmons v. Metropolitan Gov't., 2007 WL 2405132 at *4 (Tenn. Ct. App. 2007)(citations omitted).  "[S]chools, teachers, and administrators have a duty to exercise ordinary care for the safety of their students."  Haney v. Bradley County Bd. of Educ., 160 S.W.3d 886, 897 (Tenn. Ct. App. 2004).

In their respective Motions for Summary Judgment, Plaintiff, Metro and Genesis focus on the issue of foreseeability.  Genesis and Metro claim that Plaintiff cannot establish negligence because it was not reasonably foreseeable as a matter of law that Gilberto would be allegedly raped by Kolby, meaning that Plaintiff cannot establish the duty or proximate cause prongs of the negligence test.  For her part, Plaintiff claims that she has established all of the elements of a negligence claim and that she is entitled to summary judgment because it was foreseeable, given Kolby's extensive behavioral record involving sexual misconduct, that Kolby would sexually assault Gilberto.

"[I]n general terms, '[f]oreseeability is the test of negligence.'"  Downs v. Bush, 236 S.W.3d 812, 820 (Tenn. 2008)(citation omitted).   "'A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'"  Id. (citation omitted).  Conversely, "[i]f an injury giving rise to a cause of action for negligence could not have been reasonably foreseen or

anticipated, then there is no proximate cause and, thus, no liability for negligence." Rathnow v. Knox County, 209 S.W.3d 629, 633 (Tenn. Ct. App. 2006).

The issue of whether it was reasonably foreseeable to Metro and/or Genesis that Kolby would allegedly sexually assault or rape Gilberto on the school bus is clearly a question of fact for the jury. On the one hand, there is evidence (recited in detail previously) from which a jury could readily conclude that both Metro and Genesis were on notice that there was a reasonable probability that Kolby would sexually assault Gilberto, given Kolby's prior improper sexual contact with female students, his exposing himself to another young boy, the threat that he would "do it" to "the new kid," and the alarm which was expressed given that his recent contact involved younger students. Conversely, a reasonable jury could also conclude that the attack which occurred in this case was not reasonably foreseeable to either Genesis or Metro in light of the fact that Kolby's only prior, actual sexual contact was with consenting, age-appropriate females.

Given the evidence which Plaintiff has forwarded in support of her negligence claims, Defendants' reliance upon cases such as Roe v. Catholic Diocese of Memphis, Inc., 950 S.W.2d 27 (Tenn. Ct. App. 1996) and Kindred v. Board of Educ., 947 S.W.2d 47 (Tenn. Ct. App. 1996) is misplaced. Roe involved the grant of summary judgment to defendant school administrators in a case where a four-year old boy sexually assaulted another four-year old boy while both were unsupervised in a preschool bathroom. The assault was found to be unforeseeable as a matter of law inasmuch as there had never been a complaint about a sexual assault at the school and no evidence that the school had any reason to expect that type of behavior from the perpetrator.

Kindred involved the fatal shooting of a junior high school student by a high school student. About an hour before the shooting, the two had engaged in a "minor struggle," after which the high school student said "I'll be back." The shooting was found not to be foreseeable because threats and

41

skirmishes among junior high and high school aged students were not uncommon. However, carrying out a threat was uncommon, and a killing could not be reasonably anticipated because the perpetrator was not known to carry a weapon and had not caused any problems at the school.

The facts construed in Plaintiff's favor paint a markedly different picture in this case. Kolby was known to have engaged in sexual misconduct, and at one point bus and school safety plans were in place which were designed to reduce the possibility that anything untoward would occur. Nevertheless, Kolby was permitted to ride on a school bus with younger children in a relatively unsupervised environment. It will be for a jury to determine whether this constituted negligence.

The Court also rejects Metro's contention that its actions were not a substantial factor in the alleged assault. In this regard, Metro claims that it was acting at Plaintiff's request when it placed Gilberto on a smaller bus. This assertion, of course, wholly ignores the fact that Ms. Lopez repeatedly requested that Gilberto be on a bus with a monitor and that Ms. Lopez could not unilaterally determine on which bus Gilberto would ride. It also ignores the knowledge Metro had of Kolby's prior behavior and its decision to allow Kolby and Gilberto to ride on the same bus.

In light of the foregoing, the cross Motions for Summary Judgment on the claims of negligence asserted against Defendants Metro and Genesis will be denied.

**B.  Motion to Remand TGTLA Claim**

Plaintiff moves to remand her TGTLA claim against Metro on the grounds that the only proper venue for such a claim is the state circuit court under T.C.A. § 29-20-307 which provides that the state circuit courts shall have "exclusive original jurisdiction" over TGTLA claims. In support of her position, Plaintiff relies upon Gregory v. Shelby County, Tenn., 220 F.3d 433, 446 (6th Cir. 2000).

42

In <u>Gregory</u>, the Sixth Circuit noted that 28 U.S.C. § 1367(c) provides that a district court may decline to exercise jurisdiction over a claim in exceptional circumstances where there are "compelling reasons for declining jurisdiction." The court went on to reason that because T.C.A. § 29-20-307 expresses "a clear preference that TGTLA claims be handled by its own state courts, . . . [t]his unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." <u>Gregory</u>, 260 F.3d at 466.

Some courts have woodenly applied <u>Gregory</u> and dismissed supplemental TGTLA claims on the grounds that the only venue for such claims is the state circuit court. <u>See</u>, <u>Payne v. Tipton County, Tenn.</u>, 2006 WL 1967046 at *2 (W.D. Tenn. 2006). Other courts have read <u>Gregory</u> as allowing, but not requiring, dismissal of TGTLA claims and observe that federal district courts can, and commonly do, hear TGTLA claims under supplemental jurisdiction. <u>See</u>, <u>Johnson v. City of Memphis</u>, 2006 WL 2546544 at * 2 (W.D. Tenn. 2006).[10]

The district court in <u>Brown v. City of Memphis</u>, 440 F.Supp.2d 868, 878 (W.D. Tenn. 2006) adopted the latter approach. In doing so, the court observed that "[s]upplemental jurisdiction is grounded implicitly in Article III of the Constitution, and, explicitly, in federal statutory law." <u>Id</u>. at 678. Given these underpinnings, state legislatures "are powerless to impose jurisdictional constraints upon the federal judiciary," and, therefore "[w]hatever the intent of the Tennessee legislature may have been in enacting the Governmental Tort Liability Act, the authority of the federal courts to appropriately exercise jurisdiction over supplemental state law matters remains

_____

[10]In an unpublished opinion dealing with an interlocutory appeal, the Sixth Circuit noted that <u>Gregory</u> could be read as requiring that a district court decline to exercise supplemental jurisdiction over a TGTLA claim given the provisions in T.C.A. § 29-20-307, but that <u>Gregory</u> has also been read as indicating that the Tennessee Code provision "merely factors into, but does not control, a federal district court's discretionary decision whether to exercise supplemental jurisdiction over such claims." <u>Ontha v. Rutherford County, Tennessee</u>, 222 Fed. Appx. 498, 598 (6th Cir. 2007). The Sixth Circuit in <u>Ontha</u> declined to reach the issue.

43

undiminished." Id. The court then went on to hold that dismissal of the TGTLA claims would unnecessarily waste judicial and litigant resources. Id.; see, Johnson, 2006 WL 2546544 at *2 (refusing to remand TGTLA claim because claims arose out of common nucleus of facts and remand "would waste the resources of the state and federal court and the litigants").

This Court agrees with the rationale in Brown and finds that compelling circumstances do not exist so as to support a remand of the TGTLA claim against Metro. This case has been pending since August 2, 2007. The parties have engaged in extensive discovery which has been completed, and have filed lengthy dispositive Motions. Plaintiff did not file her Motion to Remand until April 1, 2009 when the trial was scheduled to commence on May 26, 2009. It would be a colossal waste of time and resources for all involved were the Court to remand a claim which arises out of the same facts as the claims which remain pending before this Court. Accordingly, the Court will exercise its discretion by denying the Motion to Remand Plaintiff's TGTLA claim.

## C. **Motion for Review**

The United States seeks review of a January 15, 2009 Order (Docket Entry No. 161) in which the Magistrate Judge denied Metro's motion to quash a subpoena *duces tecum* issued by the United States which sought the production of documents pertaining to complaints or investigations of sexual misconduct harassment, or assault on Metro school buses. In doing so, the Magistrate Judge permitted Metro to redact "the names of any reporter of sexual abuse, the victim of alleged sexual abuse and any other personal, identifying information of the reporters, victims and other persons from any documents produced to the United States." Id. at 11. The United States seeks review of the ruling insofar as it allowed Metro to produce documents which redacted the names and identifying information of alleged victims, perpetrators, and other individuals. The United States argues that its status as a law enforcement agency under T.C.A. § 37-1-612(c)(7) entitles it to access

44

such information, and that, given the redaction, it would be difficult for the United States to use the subpoenaed documents for the purpose of obtaining appropriate injunctive relief.

The Motion for Review is brought under Rule 72(a) of the Federal Rules of Civil Procedure and Rule 9(a)(1) of the Local Rules for Magistrate Judge Proceedings, both of which provide that a Magistrate Judge's non-dispositive Order may be modified or set aside only if it is clearly erroneous or contrary to law. The United States has not met its burden.

In a thorough and thoughtful Order, Magistrate Judge Griffin specifically found "that the United States qualifies for the law enforcement exception of section 37-1-612(c)(7)" (Docket Entry No. 161 at 7), but also determined that the documents to be turned over could be redacted to exclude the names of the alleged victims and perpetrators. In doing so, Magistrate Judge Griffin relied heavily on Farley v. Farley, 952 F.Supp. 1232, 1237 (M.D. Tenn. 1997), wherein Judge Wiseman adopted a deferential standard aimed to balance the competing state privacy interests and the federal civil rights objectives in order "to ensure vindication of the paramount federal interest with as minimal intrusion on the state interests as is consistent with [a] federal claim." While Magistrate Judge Griffin observed that this case "may present an even stronger case for disclosure of information otherwise protected because the requesting party is not an individual plaintiff . . ., but rather the United States Department of Justice[,]" she concluded that, as in Farley, intrusion on the state's interest codified in T.C.A. 37-1-612 could be minimized through the production of redacted records.

Having fully reviewed the matter, the Court finds no error in Magistrate Judge Griffin's decision, let alone clear error or a decision that is contrary to law. While the United States generally complains that it will not be able to fully press its claim for injunctive relief absent receipt of unredacted copies, it offers no compelling arguments as to how that would be so. It appears that

45

even the redacted documents show the number, nature, and circumstances of the incidents, including the name of the schools, the programs involved, and the types of school buses where incidents arose. As Metro points out, insofar as the United States wants to call victims and witnesses of sexual harassment at trial, this raises numerous concerns, such as the tender age of some of those witnesses, the specter of "mini-trials," and the potential for further harm to the victims in having to recount their ordeal, even though the Court does not resolve such concerns now. Given this record, the Motion for Review will be denied.

### III. <u>CONCLUSION</u>

On the basis of the foregoing, the Motions for Summary Judgment filed by the Plaintiff (Docket Entry No. 183) and the Plaintiff-Intervenor (Docket Entry No. 164) will be denied. The Motion for Summary Judgment filed by Defendant Genesis (Docket Entry No. 169) will be granted with respect to Plaintiff's Section 1983, the Americans With Disabilities Act, and the Rehabilitation Act claims, but denied with respect to Plaintiff's negligence and Title IX claims. The Motions for Summary Judgment filed by Defendant Metro (Docket Entry No. 174 and 178) will be granted with respect to Plaintiff's retaliation, Equal Protection, failure to train, ADA, and Rehabilitation Act claims, but denied with respect to Plaintiff's TGTLA and state-created danger claims under Section 1983 and Plaintiff and Plaintiff-Intervenor's Title IX claims.

The Motions for Oral Argument (Docket Entry Nos. 218 and 225) and the Motions to Strike (Docket Entry Nos. 257, 259 and 266) will be denied. The Motions for Leave to File Excess Pages (Docket Entry Nos. 204 and 246) and the Motions for Leave to File Reply Memorandums (Docket Entry Nos. 273 and 276) will be granted.

The Motion for Review (Docket Entry No. 279) filed by Plaintiff-Intervenor will be denied.

Finally, the Motion to Remand to State Court Plaintiff's Claims Under the Tennessee Governmental Tort Liability Act (Docket Entry No. 280) will also be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

Case 3:07-cv-00799   Document 459   Filed 07/07/09   Page 47 of 47 PageID #: 9691